**In re PETROLEUM CARRIERS CO.**
**No. 18276.**

United States District Court
D. Minnesota, Fourth Division.
March 11, 1954.

Lloyd P. Johnson, Minneapolis, Minn., for claimant, Ray Gamble.

Briggs, Gilbert, Morton, Kyle & Macartney, St. Paul, Minn., and Frank J. Hammond, St. Paul, Minn., for Ruan Transport Corp.

Lewis E. Solomon, St. Paul, Minn., for trustee in bankruptcy.

JOYCE, District Judge.

This matter is here upon cross-petitions for review of the order of the Referee in Bankruptcy allowing the claim of Ray Gamble in the amount of $5,597.77, and of the Referee's findings and conclusions dated September 23, 1953, and further findings and conclusions dated November 6, 1953.

Certain facts as found by the Referee are not contested and the statement thereof will serve to place this matter in perspective for the consideration of the objections.

Petroleum Carriers Company, the bankrupt, was engaged in the business of a motor carrier hauling petroleum products in intrastate and interstate commerce. In March 1949 bankrupt, being in need of additional capital, desired to sell certain Autocar tractors which it then owned under an arrangement or agreement whereby the tractors would be used in the transport service of the bankrupt by the purchasers. Accordingly at that time bankrupt published the following advertisement in the classified section of a Minneapolis newspaper:

"Opportunity

"Reliable drivers wanted who can pay $2,500 down on a truck. This is a year round job & will furnish 2-year contract. Can average up to $1,000 mo. during peak season, after operating expenses have been paid. Yearly average about $600 mo. This is not a job that anyone can get rich at but, if you are interested in a steady job & excellent working conditions with steady income don't miss this. A reliable firm with I. C. C. rights & good business record. Do not answer unless you have at least $2,500. Write N 1964 Star and Tribune."

The claimant Gamble responded to the advertisement and visited the bankrupt's place of business where discussion was had with one or more of bankrupt's officers. At this and later meetings the subject of the advertisement was discussed, Gamble was shown monthly statements of earnings of other owner operators, and was assured that

he would be paid seventy per cent of the gross revenue realized from hauling petroleum products for bankrupt with a unit consisting of a tractor to be purchased from bankrupt and a tank type trailer of 5,000 gallon capacity which bankrupt would furnish. The seventy per cent figure indicated was to be subject to deduction for gasoline, oil and tires purchased from bankrupt by claimant and it was agreed that Gamble would carry and pay for liability and property damage insurance, and would pay for fire and theft insurance if he elected to carry it. Following these negotiations and on March 15, 1949 Gamble paid bankrupt $500 toward the purchase of a 1947 Autocar tractor and bankrupt delivered to Gamble a writing signed by its authorized officer and in the following form:

"March 15, 1949

"Received this day, March 15, 1949 of Mr. Ray B. Gamble, 3245 Hennepin Ave., Minneapolis, Minn. a $500.00. The balance of $5,000.00 is to be paid upon the delivery of the tractor.

"We agree to give Mr. Gamble two years work and he is to agree to live up to the insurance companies rules. We also agree to put new tires and give a 30 day unconditional guarantee on this tractor.

"Petroleum Carriers Co.
(s) R. W. Swanson."

On March 22, 1949, Gamble paid bankrupt the $5,000 balance and received the following memorandum also in writing and signed by a duly authorized officer.

"March 22, 1949

"We, Petroleum Carriers Co., agree to deliver 1947 Autocar Motor No. 60 8739, Serial No. C70T 24090, to Mr. Ray B. Gamble which was our tractor No. 38T. Mr. Gamble has paid us $5,500 in full for the tractor and we agree to give him two years work with Petroleum Carriers Company if he lives up to our insurance companies agreement with which he is familiar.

"This agreement also covers a 30 day unconditional guarantee on work needed on this piece of equipment.

"Petroleum Carriers Co.
(s) Wm. Quist Pres."

Gamble commenced work under the above arrangement on April 1, 1949, and continued to work until February 17, 1950. For each month of this period bankrupt rendered a statement to Gamble showing gross revenue realized and allocation of 70 per cent to Gamble, less certain specified deductions. These statements which were otherwise unsigned bore the typed name of bankrupt at the top of the sheet. Nor did they refer to any particular tractor.

On March 23, 1949, bankrupt and claimant executed a written agreement complete on its face entitled "equipment lease". By the terms thereof Gamble rented his tractor to bankrupt "for a period of six months after the date hereof or from month to month thereafter" and bankrupt agreed to pay for the use and operation of the tractor 70% of the gross revenue received payable on the 15th of each month. Gamble agreed to supply a driver and pay all operating expenses as there described. It was further provided that it was not the intention of the parties to create the relation of employer and employee but that Gamble was to be regarded as an independent contractor. In addition the lease provided that it "may be cancelled and terminated by either party upon fifteen days' notice in writing delivered to the other party."

On February 16, 1950, bankrupt delivered a letter to Gamble requesting him to turn in the trailer-tank, which he had been hauling with his tractor, at the conclusion of business on Saturday, February 18, 1950, and offered Gamble the privilege of driving company equipment, requesting that bankrupt be advised of Gamble's intention in the latter regard not later than February 18, 1950. On February 17, 1950, a further letter was delivered to Gamble in which

bankrupt advised in part, "If it is your desire to operate under a lease arrangement pulling the larger 7,200 gallon tanks which are going to be used exclusively hereafter, we will be glad to co-operate with you in making such arrangements."

Gamble's tractor was incapable of hauling the larger size tanks and from the close of business on February 18, 1950, bankrupt failed to furnish any further work for Gamble as owner-driver of the Autocar tractor.

The amount paid for the tractor was found by the Referee to be $1,500 in excess of its then market value.

Petroleum Carriers Company went into bankruptcy and Gamble filed his claim in the amount of $6,566.58, asserting a contract for a period of two years with a guarantee of earnings of $600 per month, and a breach by bankrupt. Of the amount claimed $566.58 represented amounts claimed by Gamble to have been wrongfully deducted by bankrupt in making payments on the 70% basis. It was claimed such deductions were wrongful because contrary to the state-wide collective bargaining agreement then in effect to which the truck drivers' union and bankrupt were signatories.

The Trustee in accordance with his option under Section 70, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 110, asserted the defense of the Statute of Frauds, M.S.A. § 513.01, and further alleged the rights of the parties were governed by the equipment lease, containing a termination clause and that the lease was terminated pursuant thereto.

The grounds for review cited by each of the parties which are summarized in the Referee's Certificate and Return are too numerous to set out separately but will be considered seriatum in the discussion of the balance of the Referee's findings and conclusions.

The Referee found that the contract resulting from the negotiations and the three writings referred to was not capable of being performed within one year and concluded that the same was within the statute of frauds and no action could be maintained thereon unless "some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith". M.S.A. § 513.01. He further found and concluded that the sentences in the advertisement with reference to earnings did not constitute an offer or guarantee in the amount stated but were merely statements in the nature of opinion indicating the probable income to be realized and did not define the consideration intended to flow to Gamble, nor did any of the writings express such consideration which was found as previously indicated to be 70% of gross receipts.

██ It is too clear to require extended discussion that claimant's objections to the above findings and conclusions are not well taken. The evidence clearly demonstrates that the agreement was for a fixed period of two years and accordingly within the statute. Nor is the requirement of a note or memorandum satisfied by resort to those three writings. To be sufficient the memorandum must set forth all the essential terms of the agreement so that it may be proved on the basis of such memorandum without resort to parol evidence. Williston on Contracts, Revised Ed., Vol. II, Sec. 575, p. 1645. See Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88; O'Donnell v. Daily News Company, 119 Minn. 378, 138 N.W. 677.

 A number of papers may constitute a sufficient memorandum if, taken together and without the need of parol evidence to connect them, they make out a complete statement of the transaction. Halstead v. Minnesota Tribune Co., 147 Minn. 294, 180 N.W. 556. It is clear there is no incorporation by reference as to any of these writings and even assuming the papers here bear sufficient internal evidence of connection to permit their being considered as one, the resulting statement of the transaction is clearly incomplete. The evidence demonstrates beyond question that the

parties agreed upon and fixed the compensation to be paid by bankrupt to Gamble at the rate of 70% of gross receipts. This was clearly an essential element of the bargain, cannot be supplied by parol evidence, and is nowhere evidenced in the writings.

Nor is the claimant to be aided in this regard by resort to the equipment lease which did specify a rate of compensation. The lease appears on its face to be an integrated and complete agreement. It cannot be resorted to in part to establish the rate of compensation and ignored with reference to the termination provision which it contains. The lease must be considered as a separate entity. Claimant has raised no question of fraud in connection therewith nor could he be heard to urge reformation at this late date. Accordingly Findings Nos. 8 and 9 are proper.

■ Nor is there merit in claimant's contention that the agreement is removed from the operation of the statute by part performance. "The doctrine of part performance is purely an equitable doctrine, unrecognized at law, and accordingly will not sustain an action at law for damages based on contract within the statute of frauds." Hallock v. Anderson, 221 Minn. 30, 32, 20 N.W.2d 884, 885. See comment 30 Minn. Law Rev. 208. The provisions of M.S.A. § 513.06 by negative intendment compel the same conclusion. Finding and Conclusion No. 3 of the Further Findings are proper.

Nor does it appear that the State-wide collective bargaining agreement has any application to the claim of Gamble for the reasons stated in the Referee's Finding No. 10 and following Conclusion.

The Referee found that the "equipment lease" previously described was duly executed by the parties on or about March 23, 1949, and governed the rights of the parties.

With reference to the letters of February 16 and 17, 1950, the Referee made the following Finding:

"(19) The letters mailed to claimant by bankrupt, mentioned in finding 13, were neither sufficient in point of time nor from the standpoint of definiteness, certainty, or substance to invalidate or terminate the equipment lease. See Star-Chronicle Pub. Co. v. United Press Ass'n, 8 Cir., 204 F. 217.

"It will be particularly noted that in neither of said letters is there any reference to any contract or agreement whatsoever. Taken together, the letters do no more, in effect, than request claimant to turn in the tank he had been hauling and to indicate that thereafter, if he so elected, he might operate company equipment."

Deferring for the moment consideration of the objections to this Finding and the Conclusions which flow therefrom, it should be noted that there is no controversy here, nor does the evidence indicate, but that the parties considered their relationship was at an end on February 18, 1950, inasmuch as both knew that claimant's equipment was incapable of hauling the much heavier tanks referred to in the letters. If the letters were not notices contemplated by the contract they were at least clear notice of the intention of bankrupt to refuse further performance and of intent to breach the contract. In fact after February 18, 1950, bankrupt did fail to supply work for claimant.

The Referee on the theory the contract was for an indefinite time, not terminated pursuant to its terms, concluded that Gamble as one item of damage was entitled to recover for his loss of earnings on the basis of average monthly earnings during the period of performance projected through the balance of the period after breach, which was the subject of the claim and claimant's proof (the balance of two years), mitigated by deduction of money earned otherwise during that period.

■ The general rule of damages applicable in the case of breach of con-

tract is that the injured party may recover such damages as, at the time of making the contract, the parties could reasonably have contemplated would result from the breach. 2 Dunnell, Dig. & Supp. Sec. 2559. And in the usual case recovery is permitted of the profits which the injured party would have received through full performance. Anvil Mining Co. v. Humble, 153 U.S. 540, at pages 551–552, 14 S.Ct. 876, 38 L.Ed. 814.

■ It is clearly established in master and servant cases that a provision in the contract of employment providing for termination upon the giving of specified notice, or the existence of a custom providing for such termination, even if not included in terms in such contract, limits the damages recoverable by the employee upon wrongful discharge to the wages which would have accrued during the period provided for notice. 56 C.J.S., Master and Servant, § 58, page 467; Cf. Lyon v. Pollard, 20 Wall. 403, 22 L.Ed. 361.

There appears to be some suggestion in the cases involving employment contracts that the deviation from the general rule of damages, if it be one, is proper because the notice provision or custom is in effect a provision for liquidated damages. See Fisher v. Monroe, 2 Misc. 326, 21 N.Y.S. 995.

Since the contract in issue is not one of mere employment, see Buckey v. Indianhead Truck Line, 234 Minn. 379, 48 N.W.2d 534, the question here is whether the general rule of damages is to be applied, as the Referee has done, or whether the presence of the termination provision makes it proper to invoke the limitation on damages expressed in the employment contract cases.

■ The Referee's finding that the letters of February 16 and 17 were not sufficiently definite in term to constitute a notice in compliance with the contract provision is proper. See Star-Chronicle Pub. Co. v. United Press Ass'n, 8 Cir., 204 F. 217. Accordingly such cases as Lyon v. Pollard, supra, which involve situations where the notice was definite in term and preceded breach but was insufficient in point of time, are not relevant here except as they are incidentally persuasive as to the adoption of a proper rule of damage where no formal notice is given.

An examination of certain of the cases involving other than employment contracts in which the existence of a termination by notice provision was considered material indicates some uncertainty in the law.

There is substantial indication that the courts have not restricted the rule limiting damages solely to employment contracts.

"Where a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to the notice period." 25 C.J.S., Damages, § 74, page 567.

In a case involving the claimed wrongful termination of a distributor's agreement the court stated:

"But the damages must be limited to the period of notice and would include or consist of the probable profits lost within the thirty days after the plaintiff's breach of contract." James v. Dayton Rubber Mfg. Co., 57 Ga.App. 511, 196 S.E. 298, 299.

And it was held in Freiburger v. Texas Co., 216 Wis. 546, 257 N.W. 592, 593, that upon the breach without notice of a " 'service station agency contract' " which provided for termination upon five days' written notice, the aggrieved party was limited as to damages to the profits which might have been made in five days.

To the same effect in Chevrolet Motor Co. v. McCullough, 9 Cir., 6 F.2d 212, involving the termination of a franchise for the sale of automobiles. Although notice was in fact given, though after breach, the court's decision was apparently not dependent on that fact.

Damages were limited to profits to be made during the notice period in Massachusetts Bonding & Ins. Co. v. Johnston

& Harder, Inc., 348 Pa. 512, 35 A.2d 721, a case involving an insurance agency contract. There a notice was given which was defective. That the result would have been the same if no attempt had been made to give notice is indicated in Fife v. Great Atlantic & Pacific Tea Co., 166 Pa.Super. 77, 70 A.2d 369. In the latter case Fife had contracted to use his truck to haul merchandise from the defendant's warehouse to certain of its retail stores. The contract provided for cancellation by either party "'by giving the other party ten days' notice in writing.'" Fife was notified "'not to go out'" and later on the same day that no merchandise would be shipped and was later summarily told that he was "through". It was held that Fife's damages were limited to a period of ten days.

The opinion in All States Service Station, Inc., v. Standard Oil Co. of New Jersey, 73 App.D.C. 342, 120 F.2d 714, while not directly in point here because a notice was given defective only in point of time, indicates that the rule of Lyon v. Pollard, supra, is not limited to employment contracts. While this is a question of Minnesota law upon which Minnesota decisions would be controlling, there does not appear to be any clearcut decision here. But the case of Pappas v. Stark, 123 Minn. 81, 142 N.W. 1046, suggests that Minnesota would adopt a rule restricting damages in a case such as this.

Opposed to the above are some decisions which are in support of the Referee's determination, although none apparently is based upon the distinction made by him.

It was held in Oldfield v. Chevrolet Motor Co., 198 Iowa 20, 199 N.W. 161, 35 A.L.R. 889, that a notice expressly declaring a cancellation at a time short of that stipulated in the contract did not operate to work a cancellation at the expiration of the stipulated period, and to that extent is a refusal to apply the rule of Lyon v. Pollard to a contract other than for employment. However, the facts of the case make it distinguishable from that before the court. In essence it was a holding that the contract was not terminated in strict accordance with its terms and accordingly had been breached, but it did not hold that the aggrieved party was entitled to recover prospective profits for an indefinite future time. The items in dispute with reference to damages were based upon credits earned by the aggrieved party prior to breach and with respect to which the right of payment would shortly mature if the contract remained in existence. In its subsequent decision in Harrington v. Bremer County Farmers' Mutual Fire Ins. Ass'n, 203 Iowa 282, 211 N.W. 383, 384, the same court indicated that the rule of the Oldfield case was limited to situations where the termination of the contract would deprive the other party of "substantial, subsisting rights under it, which only the lapse of a short time and the continuation of the contract were required to mature." Cf. All States Service Station, Inc., v. Standard Oil Co. of New Jersey, 73 App.D.C. 342, 120 F.2d 714.

The dicta in Black v. City of Santa Monica, 13 Cal.App.2d 4, 56 P.2d 256, 257, to the effect that a notice declaring cancellation short of the time specified "is without effect and does not operate to work a cancellation" is based primarily upon the authority of the Oldfield case.

The claimant also relies upon Chevrolet Motor Co. v. Gladding, 4 Cir., 42 F.2d 440, which also is distinguishable because the contract provision provided for termination upon the existence of specified conditions which were not met. Cf. Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167.

The opinion in Merando v. Mathy, 80 U.S.App.D.C. 281, 152 F.2d 21, does not appear to deal with the question of whether damages are recoverable for loss of future profits beyond the term provided for notice of cancellation, but only with the recovery of the cost of performance already completed prior to breach and the profit thereon.

In none of the above cases dealing with contracts other than employment is

there any suggestion that the rule of damages to be applied depends upon whether or not it was the intention of the parties to have the notice provision stand as a provision for liquidated damages. Nor is there indication that resort may be had to matters dehors the contract to determine such question of intention. Since the Trustee invoked the parol evidence rule, such question could only be considered if the intention of the parties was expressed in the contract. Accordingly, it follows that the Referee's Finding No. 20 cannot be sustained.

It appears on the basis of the above cases that the weight of authority is to the effect that where a contract contains a provision for termination upon notice, recovery of future profits upon breach is limited to the period of the notice term specified. As indicated in Massachusetts Bonding & Ins. Co. v. Johnson & Harder, Inc., supra, the measure of damages for breach is the value of the contract at the date of breach but in fixing that value one must consider the length of time the contract is assured of legal life. In other words the measure of damages is based upon the expectancy value of the contract.

Accordingly the damages with respect to loss of earnings must properly be limited to a period of fifteen days, based upon the average of prior earnings under the contract as calculated by the Referee, or $293.

As previously indicated, the claimant purchased the tractor from the bankrupt at a price of $1,500 in excess of its then market value. The balance of the Referee's finding in that regard was:

" * * * the overcharge being made on the theory that the returns of claimant's employment as an owner-operator by bankrupt for a period of two years justified the overcharge."

This portion of the Finding is based upon the testimony of William Quist, president of the bankrupt.

Subsequently, the Referee made an unnumbered additional finding of fact that the overcharge was not a premium but was merely a device whereby Quist sought to unjustly enrich the corporation. The Trustee and Ruan Transport Corporation, two of the petitioners here, object to the latter finding and the allowance of $1,500 as part of Gamble's claim. The claim of petitioners is that the finding has no support in the evidence and is inconsistent with the prior finding and the unimpeached testimony of Quist upon which the prior finding was based.

The sale of the tractor at the excessive price indicated was concluded pursuant to the unenforceable two year agreement. The testimony of Quist conclusively demonstrates that the overcharge was knowingly made on his part whereas nothing appears in the record to indicate that Gamble knew of the overcharge or consented to it as part of the over-all agreement.

The payment made by Gamble certainly conferred an immediate benefit upon the bankrupt to the amount of the overcharge. All of the circumstances of the transaction, in view of bankrupt's admittedly urgent need of cash, generates an inference that the real and only purpose of the exaction was to swell the coffers of bankrupt.

The additional finding of the Referee to that effect accordingly finds substantial support in the record and insofar as it may be inconsistent with the prior finding must be deemed to have superseded it. Nor is the Referee bound to accept the testimony of Quist as to the intention of the bankrupt under such circumstances. Knuth v. Murphy, 237 Minn. 225, 54 N.W.2d 771.

Where, as here, money is paid or property transferred under an unenforceable agreement, equity and good conscience require that the recipient, to the extent that he is unjustly enriched thereby, be compelled to disgorge. Todd v. Bettingen, 109 Minn. 493, 124 N.W. 443; Pfuhl v. Sabrowsky, 211 Minn. 439, 1 N.W.2d 421.

Accordingly, the order of the Referee must be modified and the within claim allowed in the amount of $1,793, consisting of $293 as the value of future earnings for the fifteen day period prescribed for notice, and $1,500 as the amount by which Bankrupt was unjustly enriched. An appropriate form of order (with findings of fact and conclusions of law) may be prepared and submitted. Each of the petitioners may have an exception.