In re Preston Lewis CHAPMAN and
Sonja Gail Chapman, Debtors.

Preston CHAPMAN t/a Ches-Love
Cable Company, Plaintiff,

v.

AMERICAN CABLEVISION OF PENN-
SYLVANIA, INC. and James Wade,
Trustee, Defendants.

Bankruptcy No. 82–03892K.
Adv. No. 83–0743K.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 24, 1987.

Michael Donahue, Chester, Pa., for debtors/plaintiffs.

Robert B. Surrick, West Chester, Pa., for defendant/American Cablevision of Pennsylvania, Inc.

James Wade, Trustee, pro se.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION AND PROCEDURAL HISTORY

In rendering this decision, we are disposing of a matter which, for no particular reason, has become one of the most dated matters before us. This Adversary proceeding was filed on March 22, 1983, by the Husband-Debtor as Plaintiff, in the course of a joint Chapter 7 case filed on August 18, 1982, and except for disposition of this proceeding, the bankruptcy case was, for all practical purposes, completed by the Debtors' discharge on March 10, 1984.

The Plaintiff presents essentially two claims arising out of the Defendant's alleged breach of an Agreement of January 19, 1981, by which the Plaintiff contracted to install cable television systems for the Defendant cable service company: (1) Compensation for unpaid services; and (2) Damages for effectively terminating the Agreement without providing the 30–day written notice required by the Agreement.

The first claim is easily resolved in favor of the Plaintiff, as the defense that the work was not adequately performed is not supported by the weight of the evidence. The second claim presents more subtle issues of interpretation of the Agreement and the measure of damages when a contract which may be terminated at will with a prescribed notice is terminated without notice. We follow several prior decisions applying the pertinent Pennsylvania law in analogous factual settings, which indicate that a breach of contract has occurred and that damages are measured by the Plaintiff's reasonable expectations under such a contract, which are the net loss of profits for the 30–day notice period. We therefore award the Plaintiff $1,208.00 on his first claim and $3,454.50 on his second claim, directing that the sum of $4,662.50 be paid to the Chapter 7 Trustee to determine whether it is exempt property which can be forwarded to the Plaintiff.

The instant Adversary proceeding was originally scheduled for trial on June 8, 1983. The matter was continued generally on November 1, 1983, during the pendency of discovery. Although discovery appears to have been completed by June, 1984, the Plaintiff made no efforts to bring it to trial until after this Court dispatched its standing Order to dismiss inactive proceedings in May, 1986. After another general continuance in July, 1986, the matter was scheduled for trial on March 12, 1987, by praecipe of the Plaintiff.

On that day, the parties reported that a settlement had fallen through at the last minute, and they requested that the matter be continued one last time to April 23, 1987. On April 23, 1987, due to a contention by the Defendant's counsel that he did

not receive our Order of March 12, 1987, scheduling the trial, we continued it, by Order of April 24, 1987, one *last* last time to April 30, 1987. However, on April 30, 1987, the parties pleaded for one further continuance, alleging (over four years after the institution of this matter) that the Plaintiff desired to file an Amended Complaint. Yielding to these supplications, we attempted to avoid any repercussion of these last-minute delays by issuing a Pre-Trial Order of May 1, 1987, requiring the Plaintiff to file his Amended Complaint by May 8, 1987; requiring the Defendant to answer by May 22, 1987; establishing June 16, 1987, as a discovery cut-off; requesting pre-trial submission of exhibits, witness lists, and briefs by July 3, 1987; and setting July 9, 1987, as the new trial date.

Unfortunately, neither party complied strictly with the Order, possibly justifying monetary sanctions which we have imposed on several like occasions and must warn counsel that we will do if such circumstances recur in the future. The Amended Complaint was filed on May 11, 1987; the Answer was filed June 5, 1987, but not docketed nor sent to the Plaintiff's counsel until July 7, 1987. Hence, the Plaintiff moved for the entry of a default on July 6, 1987; no pre-trial stipulations, exhibits, witness lists, or briefs appeared; and the parties attempted to utilize this confusion of their own creation as a basis for further begging for a continuance on July 9, 1987. However, we rejected these pleas, and counsel proved quite able to try the case on July 9, 1987.

After completion of the Trial, we set forth a schedule, memorialized in an Order of July 13, 1987, whereby the parties were to submit Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs on or before July 24, 1987, and August 7, 1987, respectively. The parties complied in timely fashion, although the Plaintiff proceeded to submit an unsolicited Reply Memorandum on August 12, 1987, a practice which we disapproved in *In re Jungkurth,* 74 B.R. 323, 326 (Bankr.E.D.Pa.1987).

Because this is an Adversary proceeding subject to Bankruptcy Rule 7052 and, consequently, Federal Rule of Civil Procedure 52(a), and we must make certain significant factual and credibility findings to resolve the matter, we shall present this Opinion in the classic form of Findings of Fact, Conclusions of Law, and a Discussion.

## B. FINDINGS OF FACT

1. The Husband-Debtor and Plaintiff in this action, PRESTON L. CHAPMAN, was the sole proprietor of an unincorporated business organized in 1981 named Ches-Love Cable Company (hereinafter referred to as "Ches-Love").

2. The Plaintiff had previously been employed by Tri-State Cable Co. (hereinafter referred to as "Tri-State"), a business which, prior to the Plaintiff's formation of Ches-Love, had been the only business engaged in installing cable television service into residences for the Defendant, AMERICAN CABLEVISION OF PENNSYLVANIA, INC. (hereinafter referred to as "the Defendant"). The Defendant was apparently the only business supplying cable television service in Chester, Delaware County, and its environs, where Ches-Love operated.

3. Prior to forming Ches-Love, the Plaintiff had discussed the prospect of his becoming a competitor of Tri-State with the Defendant, and the Defendant had indicated an interest in such an arrangement.

4. Consistent with this prior arrangement, the Defendant entered into an "Agreement" with Ches-Love on January 19, 1981, providing that Ches-Love would perform cable installations for the Defendant.

5. The Agreement contained, *inter alia,* the following provision, at paragraph nine: "Each party shall have the right to terminate this Agreement at any time upon the giving of thirty (30) days written notice to the other."

6. Commencing in February of 1981, Ches-Love performed installations pursuant to the Agreement, working six days a week, from Monday through Saturday.

7. Ches-Love was reimbursed at the rate of $20.00 for each conventional tele-

**4**

phone-pole installation; $35.00 for each underground installation; and $5.00 extra per set for each additional set connected in the same household. The Plaintiff testified that Ches-Love received almost exclusively telephone-pole installations contracts from the Defendant.

8. Ches-Love employed at least six teams of installers and compensated them by paying them half of the amount that it received for installations. Thus, in the instance of a $20.00 installation, the installer received $10.00 and Ches-Love received $10.00. The installers therefore worked as independent contractors. Ches-Love supplied the vehicles, an office, and a secretary. The materials were all supplied by the Defendant.

9. The daily work logs of Ches-Love throughout its entire existence, all of which were admitted into evidence, indicate that, from the month of March, 1981, through February, 1982, Ches-Love performed an average of 23.3 installations per day and operated on an average of 24.5 days per month.

10. The Plaintiff testified that Ches-Love incurred the following approximate monthly business expenses:

| | |
|---|---|
| Utilities | $ 350.00 |
| Vehicle Maintenance | 200.00 |
| Office Rent | 500.00 |
| Telephone | 80.00 |
| Insurance Payments | 250.00 |
| Loan Payments | 150.00 |
| Secretary services | 640.00 |
| Office Supplies | 75.00 |
| Total monthly business expenses | $2,245.00 |

Since no rebuttal was suggested and the figures appeared reasonable and were not contested in any specifics, we credit this testimony.

11. Assuming a $10.00 income from each installation and extrapolating from the figures set forth in Findings of Fact 9 and 10 *supra,* it can be ascertained that Ches-Love's daily average income was $233.00 and daily average business expenses were $92.00. Thus, Ches-Love, from March, 1981, through February, 1982, generated a daily average net profit of $141.00 for the Plaintiff, and an average net profit over a 30–day period of $3,454.50.

12. The Plaintiff admitted that, throughout the period in which Ches-Love performed installations for the Defendant, the Defendant expressed numerous complaints about the services performed by Ches-Love's installers.

13. These complaints were resented by the Plaintiff, who believed that many of the complaints were motivated by racism of the Defendant's Installation Supervisor, Greg Farmer, since the Plaintiff and his installers were all Black persons, and its competitor, Tri-State, was owned by, and primarily employed, white persons.

14. The differences between the Plaintiff and Mr. Farmer escalated in late February, 1982, culminating in the Plaintiff's writing to Farmer on March 1, 1982, that he was insulted by Farmer's use of profanity, and Farmer's responding, on March 2, 1982, that the Plaintiff should turn in his equipment, and suspending the assignment of any of the Defendant's installation work to Ches-Love between March 2 and March 10, 1982.

15. Thereafter, the parties temporarily mended their differences, but, shortly after one of Ches-Love's installers was caught stealing the Defendant's equipment, the Defendant ceased providing any further work to Ches-Love after April 12, 1982.

16. The Defendant did not provide any written notice of termination of the Agreement, per paragraph 9 thereof (see Finding of Fact 5 *supra* ), until May 17, 1982, when its General Manager, Thomas Rutledge, directed a letter to the Plaintiff, including in the letter the statement that Ches-Love was required to maintain its insurance during the forthcoming 30–day period.

17. The Defendant did not pay Ches-Love $1,208.00 for work performed in April, 1982.

18. Although the normal practice of the parties was that the Defendant would provide Ches-Love with seventy-two hours to correct any work infractions, the Defendant, per Mr. Rutledge, without having provided any prior notice, informed the

Plaintiff, in a letter of August 25, 1982, that it was withholding all payment for the work performed in April, 1982, because of alleged infractions on one hundred and twenty-five (125) installations performed by Ches-Love, attaching a list of the addresses where such infractions allegedly occurred.

19. The only evidence presented by the Defendant to support the legitimacy of these alleged infractions was the testimony of its only witness, James D. Toth, Jr., its Lead Installer since May, 1982. Mr. Toth testified that he had personally examined forty-three (43) of the one hundred and twenty-five (125) allegedly defective installations in the summer of 1982.

20. The Plaintiff testified that he and Daniel Bishop, the former manager of Ches-Love, who was present at trial and whose testimony was admitted into record as corroborative of that of the Plaintiff by stipulation of the parties, checked every one of the one hundred and twenty-five (125) allegedly defective installations mentioned in the letter of August 25, 1982; that they discovered that most of these connections had been made a year or more prior to summer, 1982, and it was impossible to determine whether Ches-Love had originally made defective connections as of summer, 1982; and that he believed that none or very few of the installations were in fact defective.

21. We credit the testimony of the Plaintiff (and Mr. Bishop) on this point, and therefore conclude that the Defendant has produced no substantial evidence of any defective installations. We further find that the alleged inspections of the premises cited in the letter of August 25, 1982, and this letter, were concocted by the Defendant merely to evade liability to the Plaintiff.

C. CONCLUSIONS OF LAW

1. The Defendant is clearly liable to the Plaintiff for $1,208.00 for work performed in April, 1982.

2. Paragraph nine of the Agreement constitutes a term which rendered the Agreement terminable at any time on thirty (30) days notice.

3. The expectation of an aggrieved party in such a contract is that it may end any time after receipt of the notice, and therefore damages are limited to the loss of the net profits of the Plaintiff in a 30–day period.

4. The loss of profits of the Plaintiff's business for a 30–day period has been established, by reasonably reliable evidence, to be $3,454.50.

5. The Defendant is liable to the Plaintiff for the total sum of $4,662.50.

6. Since the Plaintiff is only entitled to recovery for one 30–day period, no additional damages are allowable for the temporary termination of the contract in March, 1982, or for any other lost profits or other losses, or for any punitive damages.

D. DISCUSSION

The Plaintiff's claim for the $1,208.00 for the April, 1982, services of Ches-Love follows as of course from Findings of Fact 18–21 *supra,* at pages 4 and 5 *supra.* We therefore need not discuss this claim further, except to observe that a portion of this figure may be owed by the Plaintiff to his installers, to the extent that the Plaintiff's obligations to them have not been discharged in the bankruptcy case.

The more difficult claims are those arising from the Defendant's effective temporary termination of the Agreement from March 2 through 10, 1982, and the effective permanent termination on April 12, 1982. Fortunately, we have located a number of cases which address the legal effect of very similar at-will termination clauses in service contracts, and those cases are very consistent and helpful to us in reaching our result. These cases include *Bloomfield Financial Corp. v. National Home Life Assurance Co.,* 734 F.2d 1408, 1411 (10th Cir.1984) (applying Pennsylvania law, court finds that damages are the value of contract measured by net profits over the length of time contract is assured legal existence, i.e., the notice-termination period); *Keystone Floor Products Co. v. Beattie Mfg. Co.,* 432 F.Supp. 869, 879–80 (E.D. Pa.1977) (damages for profit-loss for

breach of 60–day termination provision limited to net profits for sixty days, although additional damages of other losses could be added); *In re Petroleum Carriers, Inc.*, 121 F.Supp. 520, 525–26 (D.Minn.1954) (damages limited to net profits for 10–day termination period despite defective attempt at notice); *Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 348 Pa. 512, 518–23, 35 A.2d 721, 724–26 (1943) (damages granted despite defective attempt at notice, but limited to 30–day notice period); and *Fife v. Great Atlantic & Pacific Tea Co.*, 166 Pa.Super. 77, 80–84, 70 A.2d 369, 370–72, *cert. denied*, 340 U.S. 837, 71 S.Ct. 21, 95 L.Ed. 614 (1950) (damages limited to net profits of 10–day notice period; belated dispatch of termination notice did not affect measure of damages). *See generally*, 25 C.J.S., Damages, § 74, at 853 (1966).

■ The Defendant raises two arguments in opposition to the Plaintiffs' net-profits claim. First, it contends that the Agreement was never actually terminated until thirty days after the letter of May 17, 1982, and that the failure to provide business to Ches-Love from March 2–10 or after April 12, 1982, was not violative of the contract. Hence, it contends that it is not liable to the Plaintiff for any damages for lost profits.

This argument blinks at reality, and must be rejected. Ches-Love's very existence was dependent on business from the Defendant, which had a local monopoly on the television cable service business. The Defendant's reading of the contract would eviscerate paragraph nine of any meaning whatsoever, a result which, as the Plaintiff observes, courts seek to avoid. *See, e.g., Pocono Manor Ass'n v. Allen*, 337 Pa. 442, 446–47, 12 A.2d 32, 35 (1940). According to the Defendant's interpretation, the Defendant would never have had to provide any notice at any time, even to this day, if it intended to stop doing business with the Plaintiff and put it out of business. We observe that none of the defendants in the cases cited above which interpreted almost identical contracts ever seriously raised or succeeded in raising such an argument,

being content to argue a limitation of damages to the notice-period. We also observe that a 30–day notice is well within the range of notices considered by the courts in the above cases, and hence is eminently reasonable.

■ The Defendant also contests the quality of the Plaintiff's evidence of his income and expenses, which was derived not from books or tax records, but from compilations from a large configuration of raw records of each installation performed, admitted *en masse* into evidence, and the Plaintiff's oral testimony.

However, we believe that the Plaintiff's unrebutted evidence in this vein does, in fact, establish damages with the requisite "reasonable certainty." *See Keystone Floor Products, supra*, 432 F.Supp. at 880–882; and *Taylor v. Kaufhold*, 368 Pa. 538, 544–46, 84 A.2d 347, 351–52 (1951).

The Defendant's argument fails to appreciate the distinction made between those cases where the loss-of-profits decision turns on proof of the *fact* of the damage as a proximate result of the defendant's action, and those cases involving uncertainty as to the amount of damage. This distinction is underlined in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), where the Supreme Court noted: "It is true that there was uncertainty as to the extent of damage, but there was none as to the fact of damage." We adopted similar reasoning in measuring damages in *In re Jungkurth, supra*, 74 B.R. at 336; and *In re Russell*, 72 B.R. 855, 863–64 (Bankr.E.D.Pa.1987).

It is true that the element of loss of profits is always attended with uncertainty. *See Neville Chemical Co. v. Union Carbide Corp.*, 294 F.Supp. 649, 662 (W.D.Pa. 1968). However, the law does not require absolute certainty of data upon which loss of profits are to be estimated; all that is required is reasonable certainty that such damages are not based wholly upon speculation and conjecture. *Macan v. Scandinavia Belting Co.*, 264 Pa. 384, 107 A. 750 (1919).

In the instant case, the Plaintiff has relied upon his own records, admitted into evidence, the computations from which the Defendant, although having access to do so, has not contested. Moreover, the figures recited by the Plaintiff appear in no sense unreasonable, and the Defendant has, in no specific instance, disputed same. We expressly credited this testimony in our Findings of Fact 10 and 11, at page 4 *supra.* Thus, we conclude that the exact amount of the damages need not be proven in order to permit a recovery where the best proof possible has been adduced, as in *Patton v. United States,* 139 F.Supp. 279, 285 (W.D.Pa.1955).

Finally, the Plaintiff has suggested that the measure of damages which we have indicated that we will make is too modest. He urges that we award him $1,128.00 in lost profits for the period from March 2 to March 10, and $6,909.00 for lost profits from April 13, 1982, through June 16, 1982, which is thirty days from the date of the letter of termination of May 17, 1982, from Mr. Rutledge.

We do acknowledge that damages in addition to the loss of net profits for the 30-day termination period can be awarded, if it is proven that other sorts of losses have been sustained. *See Keystone Floor Products, supra,* 432 F.Supp. at 879. In recognition of this principle, we are already awarding the Plaintiff $1,208.00 in addition to the losses for the termination period because these damages are another distinct type of loss occasioned by the Defendant's actions.

However, we decline the Plaintiff's request to grant him additional net-profits damages. Central to our reasoning is the point made very articulately by Chief Judge Maxey in *Johnston & Harder, supra:* the "value of a contract which can be terminated on thirty days' notice," 348 Pa. at 518, 35 A.2d at 724, must be limited to damages for such a period only. This is "[t]he most that [the aggrieved party] is entitled to." 348 Pa. at 523, 35 A.2d at 726.

■ We are therefore reluctant to cumulate an additional eight days for the period in March, 1982, when the parties' original dispute resulted in a temporary cessation of job referrals to Ches-Love, onto the thirty days of net profits already allowed, in any event. Further, we do not believe that a temporary cessation of business can veritably be considered a termination of the Agreement. The Defendant's argument that the contract does not require the Defendant to assign any number of jobs to Ches-Love takes on some force in the context of this claim. Furthermore, the Plaintiff may be considered to have waived this claim by resuming his relationship with the Defendant on March 10, 1982.

■ The issue of whether the Plaintiff could extend the period for which the loss may be measured to the date thirty days after the notice was finally given is considered and rejected by Pennsylvania Superior Court in *Fife, supra.* We agree with the analysis of that Court that a contention that no termination of the contract occurred until the notice was dispatched is inherently inconsistent with the claim that damages are justified because of the complete lack of the requisite notice. 166 Pa. Super. at 83–84, 70 A.2d at 371–72.

■ We further note that any sort of punitive damages are generally inappropriate in an action, like the instant case, based solely upon breach of contract. *See In re Holmes, Holmes v. Thomas M. Durin & Sons, Inc.,* 76 B.R. 77, 78–79 (Bankr.E.D. Pa.1987).

We therefore hold that the Plaintiff's damages are limited to $4,662.50, the sum of the amount due for services in April, 1982, and the Plaintiff's reasonably anticipated net profits in the thirty-day period for which notice was not provided, in breach of paragraph nine of the contract. Noting that this sum may exceed not only the exemptions claimed on the Plaintiff's schedules, but the exemptions to which he is entitled pursuant to 11 U.S.C. §§ 522(b), (d), we are directing that this sum be initially paid to the Chapter 7 Trustee, James Wade, and that, after giving the Plaintiff an opportunity to amend his B–2 and B–4 schedules, Mr. Wade determine whether

some or all of this sum is exempt before forwarding same to the Plaintiff.

An Order consistent with this Opinion will be entered.