Anthony **BOLDURIAN**

v.

**A/B SVENSKA AMERIKA LINIEN**

v.

**J. A. McCARTHY, INC.**

Civ. A. No. 29732.

United States District Court
E. D. Pennsylvania.

Oct. 14, 1965.

Avram G. Adler, of Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Robert Cox, Krusen, Evans & Byrne, Philadelphia, Pa., for A/B Svenska Amerika Linien.

Francis E. Marshall, Philadelphia, Pa., for J. A. McCarthy, Inc.

BODY, District Judge.

The complaint in this action was filed on June 13, 1961 arising out of personal injuries to the plaintiff, Anthony Boldurian, while he was engaged in the performance of his duties in discharging cargo aboard the "Krageholm" on December 4, 1959.

Plaintiff, an employee of J. A. McCarthy, Inc., brought suit against the shipowner defendant, A/B Svenska Amerika Linien, basing his claims upon unseaworthiness and negligence. The shipowner joined the stevedoring company, J. A. McCarthy, Inc., as third-party defendant claiming indemnity.

The cause was tried before this Court and a jury on March 9, 1965 which resulted in the jury finding damages in favor of the plaintiff in the amount of $38,055.40. On March 25, 1965 this Court entered judgment and verdict upon a special verdict and awarded plaintiff damages in the amount of the verdict with costs, and entered judgment in favor of the shipowner and against J. A. McCarthy, Inc. to include amounts paid by defendant to plaintiff and expenses, fees and costs, including attorney's fees incurred by defendant.

The Court now has before it the motions of J. A. McCarthy, Inc. for a new trial or for judgment n. o. v., and the motion of the defendant, A/B Svenska Amerika Linien, for a new trial limited to the issue of damages.

At the time of the accident plaintiff was forty-eight years of age and was employed as a longshoreman in the capacity of a forklift operator. The longshoremen, including the plaintiff, were unloading bundles of hardwood which was designated as wallboard. The wallboard bundles were approximately one (1) foot to one and one-half (1½) feet thick, four (4) feet wide, and eight (8) feet in length, with the weight estimated by various witnesses ranging from one thousand (1,000) to two thousand (2,000) pounds per bundle. (N.T. 215) Plaintiff's duties consisted of lifting these bundles of wallboard with his forklift truck and placing them in such a position in the hold that they could be unloaded from the ship. Plaintiff had lifted two bundles and began backing the forklift truck down an incline of between five (5) and ten (10) degrees when the forklift truck suddenly tilted over, fell, and pinned plaintiff's foot beneath the load. (N.T. 28)

It appears from the testimony of Edward Hicks, a fellow employee of plaintiff, that as the forklift truck backed up, it struck and tilted over a block of wood three (3) feet long, four (4) to six (6) inches wide, and about two (2) inches thick which was nailed to the deck and was the same color as the deck. (N.T. 27) Mr. Hicks testified that the board could not be seen prior to the accident since the bottom bundle had been removed; and furthermore, because of the low clearance of the forklift truck, the lighting conditions and the color of the board. (N.T. 120) Both Hicks and the plaintiff testified that they did not know the board was there. (N.T. 120–124, 176)

Having set forth the facts relevant to the actual occurrence of the accident, we can now review the motion of J. A. McCarthy, Inc. for new trial and judgment notwithstanding the verdict.

I

MOTION OF J. A. McCARTHY, INC. FOR NEW TRIAL AND JUDGMENT N. O. V.

The third-party defendant's motion is based upon three main grounds which we will examine in turn.

First of all, J. A. McCarthy, Inc. argues that the Court erred in refusing to charge the jury as requested in its point No. 6 submitted to the Court.[1] The thrust of this contention is that the only real grounds urged by the plaintiff for finding unseaworthiness and negligence on the part of the shipowner was a hazardous condition created by the board, described previously, on which the forklift truck apparently tilted and fell. Therefore, the jury had to properly understand the duty of the stevedoring company with regard to the board in order for them to return a correct finding on indemnity. McCarthy's proposed point No. 6 would have been proper if the only evidence of negligence were what they contend, that is, the existence of the board. However, from a careful review of the entire record, it is clear that the Court did not commit reversible error in refusing point No. 6. In fact, reversible error would have been committed if the Court had included that point in its jury charge. This is so because, on the issue of indemnity, the contentions of the shipowner included improper and unsafe operation and procedure by the stevedore, as well as the duty to eliminate risks of injury, inadequate equipment, inadequate supervision, lack of illumination and negligence of fellow longshoremen. In view of this, the Court's charge which included these other contentions was proper. (Charge, 53–55) For these reasons, McCarthy's argument as to its proposed point No. 6 must be rejected.

Secondly, the stevedoring company contends that the Court erred in submitting to the jury interrogatory No. 4 [2] instead of its proposed interrogatories Nos. 4 and 5,[3] and in affirming the shipowner's points for charge. McCarthy argues that the jury was mislead into believing that only the shipowner's points for charge Nos. 6 and 7 were applicable to the third-party indemnity action. (Charge, 41) Furthermore, they allege that points Nos. 6 and 7 were improper in that they did not refer to the contract between the shipowner and stevedore. We conclude that the jury was fully and properly instructed on the indemnity issue and was in no way mislead by the Court's charge or interrogatories. The law is settled that recovery by indemnity is not limited to the particular provisions of the contract between the shipowner and stevedoring company since the contract includes the implied warranty to perform services in a safe, proper and workmanlike manner. [Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1955). See also, Hodgson v. Lloyd Brasileiro Patrimonio Nacional, 294 F.2d 32 (3d Cir.), cert. denied, 369 U.S. 848, 82 S.Ct. 931, 8 L.Ed.2d 8 (1962).] It is our opinion, therefore, that J. A. McCarthy's contention that shipowner's points Nos. 6 and 7 as adopted by the Court were improper, is without merit. We have carefully reviewed the record and briefs with reference to McCarthy's

---

1. J. A. McCarthy's point No. 6 was designed to instruct the jury that if plaintiff's injuries were caused by the board attached to the deck, and if the stevedoring company was not aware of the existence of the board, nor could have discovered the board by the exercise of reasonable care, then their verdict should be in favor of J. A. McCarthy, Inc. on the issue of indemnity. [p. 6, Brief of J. A. McCarthy, Inc. in Support of its Motion for New Trial and Judgment N.O.V.]

2. "4. Did any fault described in questions 1 and 2 (if you answered "yes") result from any failure of the stevedoring company (J. A. McCarthy, Inc.) to perform its obligation to discharge the cargo in a reasonably safe and workmanlike manner?" [Charge, 58]

3. "4. If you have answered 'Yes' to Interrogatories 1 or 2 did the fault of A/B SVENSKA AMERIKA LINIEN arise out of any failure on the part of J. A. McCarthy, Inc. to do its work in accordance with the contractual obligation?
5. If you have answered 'yes' to Interrogatory No. 4, was J. A. McCarthy, Inc.'s breach of this contract a substantial factor in bringing about the injuries to the Plaintiff?" [Cf. Supplemental Brief of J. A. McCarthy in support of its motion for new trial]

contention that the Court should have used its proposed interrogatories Nos. 4 and 5 instead of No. 4 and have concluded that no reversible error was committed on any grounds suggested by McCarthy. It is important to note also that no objection or exception to the Court's interrogatories was taken by counsel.

J. A. McCarthy's third main ground in support of its motion for new trial and judgment n. o. v. is that the verdict in favor of the plaintiff was grossly excessive and against the weight of the evidence on damages. Since this contention is, in essence, the same as that urged by the shipowner, A/B Svenska, in its motion for a partial new trial on the issue of damages, it will be treated as though part of that latter motion.

## II

## MOTION OF DEFENDANT A/B SVENSKA AMERIKA LINIEN FOR A NEW TRIAL ON THE ISSUE OF DAMAGES

This motion by the shipowner stems from its appraisal of the exact nature of the accident and the severity of the plaintiff's injuries, including plaintiff's medical history and work record following the accident. Defendant claims it is clear from the foregoing aspects of the case that the jury returned a verdict which was grossly excessive, shocking and apparently a result of sympathy. We now turn to the facts which bear upon the damage issue.

After the accident plaintiff left the ship under his own power and was taken to St. Luke's Hospital by ambulance where X-rays were taken of the skull and right foot. (N.T. 149–151) No X-rays of the back were revealed by the hospital records although plaintiff claims such X-rays were taken. (N.T. 181) Although plaintiff was instructed to return to the clinic or a doctor for further treatment, he did not return. (N.T. 151) He stated that he had treated himself at home. It is important to note that plaintiff never received medical treatment from any physician for the alleged ailments of his back until approximately eighteen months had passed since the date of the accident (December 4, 1959). Furthermore, no compensation was ever received, claimed or sought from the employer. And although plaintiff claimed he had a fear of doctors, the record indicates that he did avail himself of the medical facilities furnished for all longshoremen at St. Luke's Clinic at Pier 80 for knee injuries received in 1960 and 1963. (N. T. 258–259)

Plaintiff reported for work on Monday, December 7, 1959, three days after the accident, although no work was available on that day. (N.T. 181) He did work on Tuesday, December 8, 1959 and Thursday, December 10, 1959. The following week he worked every day including Saturday doing his normal work. (N.T. 182) Reviewing plaintiff's work record we find (N.T. 183–193) the following:

4–1–59 to 9–30–59 — 662 hours
10–1–59 to 3–31–60 — 568 hours (accident 12–4–59)
4–1–60 to 9–30–60 — 583½ hours
10–1–60 to 3–31–61 — 275 hours
4–1–61 to 9–30–61 — 270½ hours
10–1–61 to 3–31–62 — 526 hours
4–1–62 to 9–30–62 — 422 hours
10–1–62 to 3–31–63 — 590½ hours
4–1–63 to 9–30–63 — 622¾ hours
10–1–63 to 3–31–64 — 580 hours
4–10–64 to 9–30–64 — 568 hours

Plaintiff's explanation as to the drop to 275 hours in the period from 10–1–60 to 3–31–61 was that he had back complaints, but on cross-examination he conceded that he could not get along with his foreman, Mr. Osinski, Jr., and voluntarily quit his steady job to become a "floater" without regular employment, and remained so until 1963, when he regained a position in a regular gang. (N.T. 247–251)

Plaintiff's income tax returns from 1957 to 1964 reflect the following earnings (N.T. 200):

1957 — $4,278.64
1958 — $3,562.34
1959 — $4,510.83 (accident 12–4–59)
1960 — $4,032.69
1961 — $2,348.08
1962 — $3,157.65
1963 — $4,760.47
1964 — $5,758.97

From the aforestated earnings plaintiff has alleged a decrease of earnings of $500.00 in 1960, $1,700.00 in 1961, and $1,400 in 1962. Conceding for the moment that these losses are due solely to plaintiff's injury without considering any waterfront strikes or plaintiff's status as a "floater", the total loss of earnings sustained is $3,600.00. Plaintiff conceded that his drop in earnings in 1961 may have been due to a waterfront strike. (N.T. 264) It is also significant that once plaintiff again became a regular member of a gang, and not a "floater" as he was earlier, his earnings increased rapidly in 1963 and 1964. (N.T. 200) Plaintiff's rate of earnings was higher than normal for the first months of 1965.

As to plaintiff's medical history, it is important to re-emphasize that the accident occurred on December 4, 1959, and that he saw no doctor and sought no other medical or clinical care until he saw Dr. Rabson in April or May of 1961 at his attorney's request. A short time thereafter, plaintiff visited Dr. Krause and Dr. Erdman because he felt worse after doing some exercises prescribed by Dr. Rabson. (N.T. 186–188) Dr. Krause testified that plaintiff's X-rays showed some narrowing between the fifth and sixth lumbar vertebrae, which he interpreted as some sort of disease. (N.T. 303) He was also of the opinion that some nerve root pressure or irritation was evident from Dr. Erdman's findings. (N.T. 304)

He advised plaintiff against continuing to do heavy work, and bed rest with traction; and if this did not cure him, surgery would be indicated. (N.T. 306) His opinion was that plaintiff had a herniation of the intervertebral disc on the left side, between the fifth lumbar and first sacral vertebrae.

Plaintiff did not see Dr. Krause again until January 18, 1965 when he told him he had continued to work and in the interval of almost four years had not gone to the hospital nor sought any further medical care. At that time plaintiff continued to complain of back pain (N.T. 308), and he said that the more he worked, the more his back hurt. (N.T. 309)

X-rays taken in January 1965, when compared with March 6, 1961, showed some slight additional narrowing (N.T. 319), and a little bit more wear and tear changes. (N.T. 321) The back also showed a slight shifting forward of a vertebra which allows some added motion. (N.T. 322, 323) Dr. Krause felt that some narrowing between lumbar vertebra four and lumbar vertebra five is evident in the 1965 X-rays and attributed this to a progression of the condition. Plaintiff's condition would not improve and might get worse without surgery. (N.T. 329–330) Such surgery would require hospitalization for fourteen days to four weeks at $32.00 to $35.00 per day; and surgeons' fees of $500.00 to $600.00. Though Dr. Krause recommended such a procedure in 1961 (N.T. 346), plaintiff had not undergone such treatment. He felt that plaintiff's back problem was related to the accident. (N.T. 335)

Dr. Krause conceded that the breakdown of discs can be from disease, and that age itself is a disease (N.T. 341)

which will cause deterioration. (N.T. 342) He noted that Dr. Erdman found no muscle spasm. (N.T. 344) He would consider surgery only if bedrest and traction did not improve the condition, and admitted that plaintiff did not accept this recommendation which was made in 1961. (N.T. 346) Dr. Krause did not recommend such care following his examination in January 1965. (N.T. 346, 347)

In contrast with Dr. Krause and Dr. Erdman, Dr. Kaplan testified on behalf of the shipowner that in his examination of June 27, 1961 (N.T. 422) he found no restriction in bending (N.T. 425), no muscle spasm, legs were normal except for some atrophy of the right thigh which he attributed to a knee operation (N.T. 427), full range of hips, pulses and circulation good, leg motions normal with no complaints of pain. (N.T. 427, 428)

The plaintiff complained of some pain during bending and turning involving the back. The doctor's X-rays showed evidence of one vertebra slipping forward due to degenerative changes (N.T. 430), but that there was no evidence of nerve root pressure or muscle spasm. (N.T. 435) He found no evidence of disc herniation. (N.T. 436)

He re-examined plaintiff on March 5, 1965 and found an increase in normal bending of the spine (lordosis) and on bending forward the back curve did not reverse itself. Side bending was normal and he was able to arch his back well; there was no evidence of muscle spasm. On leg raising, plaintiff's responses were bizarre and the doctor found a massive effusion into the right knee, which means water on the knee. (N.T. 437, 438, 439) This condition is disabling indicating irritation of the lining of the knee joint.

The forward slipping of the vertebra at L-4, L-5 interspace had increased from 1/8″ to 1/4″ and the L-5, S-1 interspace had narrowed, indicating a progressive degeneration which he attributed to wear and tear and hard work. (N.T. 440, 441)

The doctor clearly gave as his opinion that plaintiff's condition was not a herni-

ated disc but the wearing out of a disc, i. e. discogenic degenerative disease, (N.T. 452) a generative hypertrophic arthritis. (N.T. 462) This condition could cause pain in the back which could also radiate into the leg by the end of the day. (N.T. 472) The doctor could not say that this condition of degeneration took place over a period of years. Such degeneration is entirely consistent over a period of three to ten years without trauma. (N.T. 474) The doctor's opinion was that on the two occasions he examined the plaintiff, there was no evidence of bulging or herniated disc. (N.T. 484)

This Court concludes, after a careful review of plaintiff's medical history and of his work record and earnings before and after the accident, that plaintiff did not suffer from any disabling injury to his back. As stated before the total loss of earnings sustained by plaintiff, if any, was in the amount of $3,600.00.

Where, as in this case, the Court is of the opinion that a properly instructed jury has returned an excessive verdict, it may make a conditional order granting a new trial on the issue of damages unless the plaintiff remits the excess. Fornwalt v. Reading Co., 79 F. Supp. 921 (E.D.Pa.1948)

In determining that the verdict of $38,055.40 in this case is excessive, we take into consideration the evidence of the accident, plaintiff's injury, the treatment at St. Luke's Hospital the day of the accident, the absence of treatment for eighteen months thereafter except at home, and the review of plaintiff's working hours and income tax returns. Considering the fact that plaintiff had a "bad back" (as conceded by defendant), lost a maximum of $3,600.00 from work due to the accident, and has suffered recurring pain, we feel that a fair amount consistent with the injury and damages revealed in the record would be $20,055.40

ORDER

And now, this fourteenth day of October, 1965, it is ordered that the motion

of the third-party defendant, J. A. Mc-Carthy, Inc., for a new trial or for judgment n. o. v. be and the same is denied.

It is further ordered that the motion of defendant, A/B Svenska Amerika Linien, for a new trial on the issue of damages be and the same is granted unless the plaintiff, Anthony Boldurian, within ten (10) days after service of this order, shall in a writing filed with the Clerk of the United States District Court for the Eastern District of Pennsylvania remit the sum of $18,000.00.