KEYSTONE FLOOR PRODUCTS CO.

v.

The BEATTIE MANUFACTURING CO. and Cherokee Corporation.

The BEATTIE MANUFACTURING CO.

v.

Richard A. FREED and Stephen Freed.

Civ. A. Nos. 73–1016 and 74–2315.

United States District Court, E. D. Pennsylvania.

May 16, 1977.

time barred because there was a waiver filed for 1967, but not for 1969.

James J. McCabe, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiff.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

Presently before the Court is defendant The Beattie Manufacturing Company's (Beattie) motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial pursuant to Rules 50(b) and 59, Federal Rules of Civil Procedure, in Civil Action No. 73–1016. Plaintiff, Keystone Floor Products Company (Keystone) makes no separate motion with respect to this action and neither party advances any motion with respect to the consolidated case, Civil Action No. 74–2315.

The amended complaint, by which Keystone originally sought injunctive relief in its action against Beattie,[1] contains four counts, breach of contract, malicious interference with contract, unfair competition and violation of the anti-trust laws. Beattie, by way of counterclaim, asserted claims against Keystone for an outstanding indebtedness, failure to use best efforts and fraud.

The case proceeded to trial before the Court and a jury on all claims. However, upon Beattie's motion at the close of Keystone's case, a directed verdict pursuant to Rule 50(a), Federal Rules of Civil Procedure, was entered on Keystone's antitrust claim and also as to Keystone's claims against defendant Cherokee Corporation. At the close of Beattie's case its count charging failure to use best efforts was withdrawn. The remaining issues were submitted to the jury.

By answers to special interrogatories the jury found that Beattie had breached its contract with Keystone and awarded plaintiff $1,500,000.00 damages. The jury further found that Beattie was liable for malicious interference with contract, however, only nominal damages were awarded. As to the unfair competition claim, the jury found that Beattie was not liable.

In addition, with respect to Beattie's counterclaim, the jury determined that there was an outstanding debt of $119,-000.00 owed by Keystone to Beattie but found that Keystone was entitled to an offset of $47,800.00 and thus awarded Beattie $71,200.00, plus interest of $8,544.00. Beattie's claim of fraud was rejected by the jury.

Although defendant's post-trial motions raise a number of questions, the argument most strongly advanced is that the record provides no basis upon which the jury could award damages of $1,500,000.00 on the breach of contract claim. In certain respects Beattie's position on this point is persuasive. Thus, for the reasons set forth herein the Court recommends that Keystone agree to a remittitur of all damages in excess of $149,440.00. In the alternative, a new trial on the issue of damages relating to the breach of contract claim will be granted.

## I. FACTS [2]

Keystone is a Pennsylvania Corporation engaged in the distribution of carpeting to retail outlets in Eastern Pennsylvania, Southern New Jersey, Delaware and the Baltimore-Washington area. The company is equally owned and operated by two brothers, Richard A. Freed and Stephen Freed, who assumed control of the business after their father's death. Beattie is a New Jersey corporation engaged in the manufacture and nationwide distribution of carpeting.

Business dealings between the parties began in 1966 and by 1968 the parties had reached an oral understanding that Keystone was Beattie's distributor in the Philadelphia region. Although there was no written agreement, on May 25, 1970, Beattie sent Keystone a copy of its "General Terms and Policies for Distributors" (Gen-

---

1. See: *Keystone Floor Products Co. v. Beattie Manufacturing Co.,* 360 F.Supp. 588 (E.D.Pa. 1973).

2. The following summary pertains primarily to facts relating to Keystone's breach of contract claim and Beattie's counterclaim for an outstanding indebtedness.

eral Terms).[3] The General Terms covers a number of topics including credit terms and claims handling. As to credit terms it provides in Paragraph 5:

"Terms are either 5% 30 days, net 31, or 4% 60 days, net 61, not both. Confirmation of order will specify which terms apply. No anticipation allowed. Interest at 1½% per month will be charged on all past due invoices."

The document also refers to termination of the distributorship agreement in Paragraph 15 which provides:

"The mill distributorship relationship may be discontinued without cause, provided 60 days notice is given by either party. This practice will be considered as common usage and both parties will be notified where the communication was made as was this by certified mail, return receipt requested."

In addition the Freeds' oral testimony indicated that the understanding of the parties was that Keystone had a sole and exclusive distributorship. Consistent with their testimony was a letter from John Beattie, President of defendant, to Richard Freed dated January 17, 1972, in which he stated:

"As we have discussed in recent weeks, your company [Keystone] handles the Beattie line in your trading area, including Philadelphia, Baltimore, Washington and North Jersey. In this territory you have sole distribution of the Beattie Carpet Line.

If you have any further questions relative to this arrangement, please get in touch with me."[4]

Sometime after receipt of this letter plaintiff became aware that defendant was distributing its carpets through David Hockstein Associates (Hockstein) in the Baltimore-Washington-Virginia region. On March 2, 1972 Richard Freed directed a letter to John Beattie complaining of the sales to Hockstein.[5] Receiving no response he sent a second complaining letter to John Beattie on March 15, 1972[6] which took a harsher tone. John Beattie replied by letter dated March 17, 1972, wherein he stated:

"I wish to acknowledge receipt of your recent letters again calling our attention to a condition discussed previously relative to David Hockstein Assoc. Upon receipt of your first letter two weeks ago, I began an investigation into the actual facts. You have my complete assurance that we will abide by our letter dated January 17, 1972.

You will be hearing from me shortly, relative to the outcome of this investigation."[7]

Unbeknownst to Keystone, Beattie continued shipments to Hockstein.

John Reilly of Beattie testified that Hockstein was a "private label" distributor as distinguished from a "running line" distributor. Running line carpet is a product sold by the distributor under the manufacturers label or brand designation. Private line carpet is exactly the same product sold under the private label of a particular distributor. Although the distinction is recognized in the industry it seems to be, largely, one without a difference. In any event, as Richard Freed testified, he later learned that Beattie shipped running line carpet to Hockstein through November 1972 using coded invoices as a subterfuge. These circumstances eventually led to discontinuance by Keystone of its operations in the Baltimore-Washington vicinity.

Beginning with the Hockstein matter, 1972 turned out to be an eventful year for the Keystone enterprise. In July of that year it moved from its small warehouse facility on Hunting Park Avenue in Philadelphia to a newly constructed, larger warehouse in Cornwells Heights, Pennsylvania. The move resulted in an increase in Keystone's physical plant costs from $22,000.00

---

3. Plaintiff's Exhibit P–22.

4. Plaintiff's Exhibit P–18.

5. Plaintiff's Exhibit P–19.

6. Plaintiff's Exhibit P–20.

7. Plaintiff's Exhibit P–21.

per year to approximately $80,000.00 per year and was made, according to Richard Freed, partly at the suggestion of John Beattie as a measure intended to increase the volume of sales. An employees' strike which lasted from August to October, also highlighted the year. During the strike Stephen Freed, who had been an outside salesman from the time he joined the company, came inside and took an active part in the day to day management. Another noteworthy development occurred after Stephen Freed found he was greatly satisfied by his new role in the management of the company. That is, he informed his brother, Richard, that he sought to buy out his interest. Richard Freed was apparently receptive to the idea and as of late January 1973 for all intents and purposes he had removed himself from the management of the company.

During the latter part of 1972 Keystone's leading seller was a product called "Supervelour," supplied by a company other than Beattie, Vernon Carpet Mills. The next two leading sellers were, however, supplied by Beattie and, in fact, Beattie merchandise constituted approximately 80% of Keystone's inventory of carpet. In purchasing such a large quantity of its inventory from Beattie, Keystone was, naturally, quite dependent upon the relationship. When certain delivery problems began to occur, they were not without considerable adverse effect upon plaintiff's organization.

The delivery problem manifested itself in two ways. First, because of late deliveries Keystone could not adequately supply its retail outlet customers. Kathryn Kucinskas, an order clerk at Keystone, testified that during Christmas 1972, poor deliveries caused Keystone to suffer a number of cancellations. Second, when Beattie filled orders Keystone found that faster moving inventory was supplied in a disproportionately low percentage compared to slower selling inventory. For example, if Keystone placed an order for a brand of carpet called "Treasure Island" broken down into ten rolls of gold and ten rolls of green (fast sellers) and two rolls of purple and two rolls of white (slow sellers), when Beattie would fill the order they would supply only two rolls of each color. Over a period of time this resulted in Keystone's inventory becoming overstocked in slow moving merchandise. As a consequence of the inventory problems, according to the testimony of Stephen Freed, plaintiff had to cancel 1000 rolls in early 1973.

It was also during the latter stages of 1972 that Keystone's outstanding account with Beattie began to reach substantial proportions. As of October 14, 1972 the debt was approximately $456,770.04. There was, however, some difference of opinion as of the exact amount of the debt, due principally to differences in bookkeeping systems. By letter dated November 14, 1972,[8] from Beattie signed by Philip Mintz, credit manager of Beattie, and Richard Freed, Keystone was allowed a credit of $26,383.25 leaving an outstanding balance of $430,386.79. The letter also provided that Keystone waived "any and all claims or deductions pertaining to invoices dated up to and including October 27, 1972." But, there was also an addendum initialed by both parties which provided that "[n]othing in the above agreement shall be construed to preclude either party from seeking further remedies from any and all disputes." Thereafter, on February 28, 1973 Keystone returned $200,000.00 worth of carpeting and made a partial payment leaving, by Beattie's records, an approximate balance of $124,000.00. Richard Freed testified, in effect, that although this figure was substantially correct it was off by several thousand dollars.

Although the General Terms provides for credit terms, the financial arrangements between the parties involved the practice of factoring. In this case Keystone's account was factored through Citizens and Southern Factors (C & S). According to John Beattie defendant employed factoring in order to assure payment.

8. Defendant's Exhibit D–14.

Sometime around March 22, 1973 Dick Zimmerman of C & S met with Stephen Freed ostensibly to examine Keystone's financial condition. The results were apparently negative because on March 28, 1973 Beattie received a Telex from C & S indicating that due to Keystone's deteriorating financial condition and losses C & S declined to continue factoring Keystone's account.

By letter dated April 25, 1973 [9] Beattie terminated the Keystone distributorship. Beattie's asserted reasons for termination were the reduction of Keystone's sales of Beattie products, disproportionate claims submitted by Keystone to Beattie, the imminent change in ownership, the worsening condition of plaintiff's business and Keystone's failure to obtain adequate factoring. In short, it was Beattie's position that continuation of the distributorship would have been injurious to it and, thus, it claimed that in March 1973 it began looking for an alternative method of distribution in the Philadelphia area.

Beattie, however, failed to afford Keystone sixty days notice. It abruptly cut off Keystone's credit and immediately began distribution in Keystone's territory. Albert Levenkron, formerly an employee of Keystone who left shortly before termination and went with Beattie, admitted that by May 1, 1973 Beattie was in direct distribution in Philadelphia. George Sherenian, a Keystone salesman, testified that several of his retail outlet customers had been solicited by Beattie salesmen in April 1973. He cited Modern Carpet as an example. At Modern Carpet, Keystone's price list [10] had been modified by Herb Sulkin of Beattie, showing Beattie's new, lower prices. In addition, Robert Levin, a warehouse equipment salesman, testified that he had sold Beattie storage racks for its new warehouse in Philadelphia and that he was first contacted about the transaction on April 18, 1973.

The abrupt manner in which the distributorship was terminated and the fact that Beattie immediately began to compete caused Keystone a number of problems. First, because Beattie was offering its carpet at lower prices, Keystone could not sell its inventory of Beattie merchandise. Second, as Richard Freed testified, the purpose of the sixty day notice provision was to provide the distributor with some continuity and to protect it from a quick change in the relationship. However, under the circumstances, it took Keystone until October 1973 to get another major supplier, Stephen Lee, and until December 1973 to get a second, Roxbury Carpet Mills.

A third consequence of the abrupt termination concerned Keystone's samples of Beattie products which remained with Keystone's retail outlet customers. Samples are basically swatches of carpet taken from various rolls and placed among the distributors' customers. Each sample is labeled by brand name. Testimony showed that the use of samples is important in this industry.

Testimony also showed that when a distributor ceases a relationship with a manufacturer, one of the first measures taken by the distributor is to withdraw all samples of that manufacturer's goods that have placed with its customers. In this instance Keystone's customers were unwilling to release Keystone's Beattie samples. There was testimony to the effect that the reluctance was due to the fact that Keystone's customers knew that Beattie was in direct distribution in the territory. It seems equally clear, however, that Keystone's salesmen knew the samples could be pulled because, technically, they were the property of Keystone but that they chose not to pull them in order to preserve customer relations.

The testimony pertaining to damages varied greatly. Keystone believed that one aspect of damage was the value of samples. Stephen Freed testified that Keystone placed Beattie samples in approximately 1500 to 2000 retail outlets at a cost to Keystone of, depending upon the exhibit

9. Plaintiff's Exhibit P–6.

10. Plaintiff's Exhibit P–6.

considered, either $51,589.30 [11] or $132,524.67.[12] John Reilly also testified that the samples were worth as much as nine times what they cost Keystone. Hence, Keystone maintained that by using the lower of the two cost figures the samples were worth some $464,303.70. There was also the testimony of Lawrence Schwarz of Keystone, however, that perhaps as much as $10,000.00 worth of the samples at Keystone's cost remained in Keystone's warehouse.

Based on interrogatories and answers thereto [13] Keystone established through the testimony of Richard Freed that from April 1973 to April 1975 Beattie's gross sales in the Keystone territory exceeded $6,000,000.00. Based on the fact that Keystone's gross mark-up on the sale of Beattie's products was twenty-five (25%) percent, Keystone maintained that its lost profits amounted to $1,554,882.45.

Keystone claimed that Beattie made sales to David Hockstein from January 1971 to June 1973 totalling $162,702.20 [14] and that Beattie's pre-termination sales in Keystone's territory totalled $43,895.93. Since Keystone's mark-up on Beattie carpet was 25%, the latter figure yielded a damage claim of $10,973.98.[15] Keystone also claimed that because Beattie's gross sales in the 60 days following termination totalled $82,559.70 considered, again, in light of the 25% mark-up entitled it to a separate damage claim of $20,639.99.[16]

Through the testimony of Martin Parelman, a certified public accountant, Keystone endeavored to establish the economic consequence of the breach to Keystone.[17] He testified that he considered financial data for a five year period starting with February 1, 1970. In reviewing the financial data he found that for the fiscal year ending January 31, 1971, there was a gross sales volume of approximately $2,400,000.00; for 1972 it was $3,377,000.00; and for 1973 it was $3,400,000.00. For the fiscal year ending January 31, 1974, the year of termination, Keystone's sales volume dropped to $2,000,000.00.

Based on the figures for the years prior to termination Parelman determined that a conservative estimate of growth was a yearly increment of 7½% which he testified took into consideration the move to the new warehouse and the strike. He also found that Keystone's average gross profit was 25.5% over the five year period. In his opinion Keystone should have shown net income of $50,045.00 in the fiscal year ending January 1, 1974, and $97,692.00 in the fiscal year ending January 1, 1975. Actual figures for 1974 were a loss of $174,115.00, translating to a swing of $224,160.00, and for 1975 actual income was a net positive figure of $22,872.00, translating to a swing of $74,820.00. By adding the two swing figures Parelman calculated damages caused by business disruption to be $298,980.00.[18]

Finally, Keystone attempted to establish a number of credits, adjustments and unpaid commissions as follows: (1) credit for defective product and inspection charges totalling $32,811.74; [19] (2) credit for damages and shortages totalling $4,314.05; [20] (3) credit for miscellaneous chargebacks totalling $10,616.91; [21] (4) credits claimed for ad-

---

11. Plaintiff's Exhibit P–25.

12. Plaintiff's Exhibits P–36, P–37, P–38 and P–39.

13. See: Plaintiff's Interrogatories (Question 29) Document No. 34, filed February 7, 1975, and Defendant's Answer Document No. 41, filed May 28, 1975, in Civil No. 73–1016 (E.D.Pa.).

14. Plaintiff's Exhibit P–31.

15. Plaintiff's Exhibit P–31.

16. The $82,559.79 gross sales figure is necessarily a duplication, in part, of the $6,000,000.00 gross sales figure discussed, supra.

17. It seems clear that this testimony related to all four claims asserted by plaintiff, however, it will be considered here in relation to breach of contract claim alone.

18. Plaintiff's Exhibit P–35.

19. Plaintiff's Exhibit P–26.

20. Plaintiff's Exhibit P–27.

21. Plaintiff's Exhibit P–28.

justments totalling $2,063.95;[22] (5) bill and hold claim for merchandise paid for but not received totalling $14,376.83;[23] (6) cancellations following termination totalling $57,-692.31;[24] and (7) credit claimed for undetermined commissions totalling $5,977.37.[25]

## II. POST–TRIAL MOTIONS

Defendant's specific grounds in support of its post-trial motions are:

(1) Plaintiff failed to establish any rational basis on which the jury could have concluded that defendant breached the distributorship agreement;

(2) The 60 day termination provision contained in the General Terms limits the period for which damages may be assessed as a matter of law;

(3) Plaintiff failed to establish any rational basis on which the jury could have concluded that it suffered $1,500,000.00 damage as a result of the asserted breach of contract;

(4) The Court erred in the admission of certain evidence and by its failure to strike or otherwise instruct the jury as to this evidence; and,

(5) The jury arbitrarily reduced the amount of plaintiff's outstanding indebtedness from $122,368.84 to $119,000.00 and that the jury erred, as a matter of law, in finding that plaintiff was entitled to an offset of $47,800.00.

■■■ In considering defendant's motion for judgment notwithstanding the verdict it is the Court's function to determine whether there is substantial evidence in support of the jury's verdict. A judgment n.o.v. may not be granted unless, as a matter of law, it is found that plaintiff failed to present a case for the jury, and that a verdict in defendant's favor should have been directed at the end of the trial. *Neville Chemical Company v. Union Carbide Corp. (Neville)*, 422 F.2d 1205, 1210 (3d Cir. 1970); *Gatenby v. Altoona Aviation Corpo-ration (Gatenby)*, 407 F.2d 443 (3d Cir. 1968). Substantial evidence, that is, legally sufficient evidence, is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969); *Smith v. B. P. Tanker Company, Ltd.*, 395 F.Supp. 582 (E.D.Pa.1975). In making this determination the trial judge must view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner. *Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471 (3d Cir. 1973).

■■■ On the other hand, in considering a motion for new trial the trial judge's discretion goes further than a mere inquiry as to the sufficiency of the evidence. Even where there is "substantial evidence" the trial judge may set aside a verdict for the reason that it is against the clear weight of the evidence, or that damages are excessive, or that substantial errors occurred in the admission or rejection of evidence. *Neville, supra* at 1221; *Silverii v. Kramer*, 314 F.2d 407, 413 (3d Cir. 1963); *Lind v. Schenley Industries, Inc. (Lind)*, 278 F.2d 79, 87 (3d Cir. 1960); Wright & Miller, *Federal Practice and Procedure*: Civil § 2805. As the Court in *Lind, supra* at 89, quoting Professor Moore,[26] pointed out:

". . . The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice."

22. Plaintiff's Exhibit P–34.

23. Plaintiff's Exhibit P–33.

24. Plaintiff's Exhibit P–29.

25. Plaintiff's Exhibit P–30.

26. 6 Moore's Federal Practice, 2d Ed., p. 3819.

## A. BREACH OF CONTRACT

Keystone's position with respect to the breach of contract claim is that the agreement of the parties provided, *inter alia*, that Keystone had the right to sell Beattie's carpet, both private and running labels, in the designated territory, that Beattie would not itself solicit any sales in the territory and that Beattie would not appoint any other selling agent in the territory. In substance, Keystone maintained that it had a sole and exclusive distributorship. Additionally, Keystone claimed that it had the right to purchase carpet pursuant to specified credit terms and that it was entitled to at least 60 days prior notice by registered mail of a decision to terminate the relationship.

An examination of the General Terms document sent to Keystone discloses that it contains no specific term pertaining to a sole and exclusive arrangement. In Pennsylvania, whose law both parties apparently agree applies, there are cases which discuss the failure to include such a term in a written contract. In *Dahath Electric Co. v. Suburban Electric Company,* 332 Pa. 129, 2 A.2d 765 (1938), a distributor attempted to establish that he had an exclusive distributorship based on an understanding reached during the negotiations which preceded the making of the contract, although the contract did not contain such a term. The Court noted that the contract had been created by competent businessmen, that it was clear on its face and that had the parties contemplated an exclusive agency, a most important feature, it would have been expressly provided for in the agreement. The Court, in effect, held that the parol evidence rule precluded the introduction of oral testimony pertaining to preliminary conversations and, thus, that the trial court properly construed the contract as being nonexclusive. *Home Builders of Mercer County v. Dellwood Corp.,* 379 Pa. 255, 108 A.2d 731 (1954), is to the same effect.

These cases are distinguishable, however, from the case at bar. Here, it has never been suggested that the General Terms constituted an integrated agreement; rather, it has been Keystone's position that the distributorship agreement was partly composed of oral terms. The parol evidence rule does not apply in such circumstances. *Yezbak v. Croce,* 370 Pa. 263, 88 A.2d 80, 81 (1952). Thus, the full and exact terms of the agreement may be established by oral testimony. *Keller & Voelker, Inc. v. Kellett Aircraft Corporation,* 192 Pa.Super. 25, 159 A.2d 561 (1960). The surrounding circumstances and the course of dealings between the parties may also be considered in establishing the terms of this type of agreement. *Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 228 A.2d 656 (1967); *City of Erie v. R. D. McAllister & Son,* 416 Pa. 54, 204 A.2d 650, 660 (1964); *Amerofina, Inc. v. U. S. Industries, Inc.,* 232 Pa.Super. 394, 335 A.2d 448, 452 (1975). And, once such evidence is admitted, the terms of the contract becomes a question of fact to be resolved by the fact finder. *Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689 (1973); *Calderoni v. Berger,* 355 Pa. 418, 421, 50 A.2d 332, 333 (1947); *Castellucci v. Columbia Gas of Pennsylvania,* 226 Pa.Super. 288, 310 A.2d 331 (1973).

There is here considerable evidence of the conduct of the parties which indicates that they treated the arrangement as an exclusive distributorship. John Beattie's letter dated January 17, 1972, for instance, provides, in part, that "[i]n this territory you have sole distribution of the Beattie Carpet Line." Perhaps more persuasive is testimony that, after Keystone complained of sales to Hockstein, Beattie used coded invoices in an apparent attempt to conceal these other dealings.

In the Court's view the record provides ample support for the jury to conclude, as it evidently did, that the parties believed that a business relationship between them had been created and that it was a relationship having the substance and binding commitments as Keystone contended. In addition, there was substantial evidence that Beattie sold carpet to Hockstein, that the 60 day notice was defective and that Beattie solicited and actually sold di-

rect in Keystone's territory well before expiration of 60 days after the notice of termination. This evidence clearly warranted the jury in finding that Beattie breached the distributorship contract with Keystone.

## B. *60 DAY TERMINATION PROVISION*

 Under Pennsylvania law the rule governing damages for a claim of breach of contract is as follows:

"Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provides otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved." (italics omitted). *Taylor v. Kaufhold (Kaufhold)*, 368 Pa. 538, 546, 84 A.2d 347, 351 (1951).

Defendant suggests that the applicability of this rule is restricted to some extent in the instant circumstances. It argues that:

"A long line of cases have held that where a distributorship or other agency contract provided for its cancellation on a specified notice, the measure of damages for future lost profits for the principal's breach of the contract cannot exceed the loss of profits on sales which plaintiff proves could have been made during the specified cancellation notice period."[27]

In support of its position Beattie relies most strongly on the holding in *Massachusetts Bonding & Insurance Co. v. Johnston & Harder, Inc. (Massachusetts Bonding)*, 348 Pa. 512, 35 A.2d 721 (1943). In that case the defendant filed a counterclaim against plaintiff seeking damages for summary cancellation of its general agency contract. The contract was subject to termination without cause upon 30 days written notice. The trial court awarded damages of $27,-500.00. The Pennsylvania Supreme Court reduced the award to $2,811.50 noting that all of defendant's damage witnesses failed to consider as a factor in evaluating defendant's damages that, at the will of plaintiff, the contract could cease to exist within 30 days. In addition, the Court observed that:

"The only loss occasioned this defendant Johnston & Harder, Inc., by the plaintiff's failure to give thirty days' notice of the cancellation of the agency contract *which we find warranted by this record* is the loss of thirty days' profits on the casualty business which it could write during that period for the plaintiff." (emphasis added).

*Massachusetts Bonding, supra* at 724.

The Court went on to discuss, however, that there could be other types of pecuniary losses sustained by a breach of this type of contract. For instance, it discussed the possibility that a summary termination in this setting could have a severe impact on the continuation of a well-established business. The ease with which the summarily terminated agent could find new principals to represent was also considered a relevant factor. Thus, to the extent that Beattie argues that, as a measure of damages, lost profits due to lost sales must be limited to provable lost sales within the termination period it correctly states the law. Perhaps another way of stating the proposition is that at any given point in time, a contract terminable at will upon 60 days notice, assures at most 60 days worth of sales to the injured party. On the other hand, the Court agrees with Keystone to the extent that it maintains that the holding of *Massachusetts Bonding* must be considered in conjunction with its facts and that the termination notice period does not necessarily and under any and all circumstances set the parameters for provable damages in this type of case.

 The facts of the instant case clearly establish that Beattie constituted more than 80% of the supply of Keystone's inventory. It has been Keystone's position throughout that the purpose of the termination notice

---

27. Defendant's Supplemental Memorandum, Document No. 88 in Civil No. 73–1016 (E.D.Pa. filed December 17, 1976).

period was to provide it with an opportunity to make an orderly transition to other suppliers. Given Keystone's extraordinary dependence on Beattie, of which Beattie was well aware, a jury could certainly conclude that a natural and ordinary consequence of the summary termination and immediate move into the market was a significant disruption of what might otherwise have been an orderly transition by Keystone to new suppliers.

## C. DAMAGES

Pennsylvania law provides that damages for breach of contract must be proved "with reasonable certainty." *Wilcox v. Regester,* 417 Pa. 475, 207 A.2d 817, 822 (1965). In this connection it has been stated that:

"[t]here can be no award for breach of contract (except in certain cases an award of nominal damages) when there is no evidence produced by which the jury can measure the damages. Damages cannot be awarded by guess work. The Restatement of the Law of Contracts, Sec. 331, lays down the following: 'Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.' In *Rice v. Hill,* 315 Pa. 166, 172, 172 A. 289, 291, this Court held: 'Damages are never presumed; the plaintiff must establish by evidence such facts as will furnish a basis for their assessment, according to some definite and legal rule.'"

*William B. Tanner Co., Inc. v. WIOO, Inc.,* 528 F.2d 262, 272 (3d Cir. 1975).

One of plaintiff's principal damage claims relates to the samples purchased by it from Beattie and placed with its retail outlet customers. With respect to this item of damage plaintiff contends that:

". . . because of the method chosen to breach the contract and the manner in which it occurred, [Keystone's] samples

were captured and exploited by the defendant for its own use. The remedy of restitution is available against a wrongdoer whether the action sounds in assumpsit or tort since an unjust enrichment can result from a breach of contract or tortious conduct.

The general rule established by the Restatement of Restitution, § 1 (1937) is that a person who has been unjustly enriched at the expense of another is required to make restitution to the other. *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 704 (E.D.Pa.1973)." [28]

It is the Court's recollection that during the trial there was some confusion as to precisely which theory of liability asserted by plaintiff the samples related. At this time, obviously, plaintiff endeavors to label it as a restitutionary recovery on a theory of unjust enrichment. The question thus presented here is more one of liability than damages. As the Court in *Weiner v. Bank of King of Prussia,* cited immediately above by plaintiff, went on to provide at 704:

"In order to sue in assumpsit for unjust enrichment, a plaintiff must establish that a defendant has received money which rightfully belongs to the plaintiff. There must be some privity between the parties with relation to the money sought to be recovered. The defendant must have received money which belongs to the plaintiff. *Caskie v. Phila. Rapid Transit Co.,* 321 Pa. 157, 184 A. 17 (1936); *Humbird v. Davis,* 210 Pa. 311, 59 A. 1082 (1904).

It is clear that if the plaintiff has any claim for unjust enrichment, it can only be against the bank which actually received money from him. The plaintiff cannot possibly assert a cause of action for unjust enrichment against banks which never received any money from him."

The evidence adduced by plaintiff pertaining to the samples established merely that plaintiff paid either $51,589.30 or $132,-

---

**28.** Plaintiff's Supplemental Memorandum, Document No. 89 in Civil No. 73–1016 at p. 41 (E.D.Pa. filed January 18, 1977).

524.67 for samples during the course of its relationship with Beattie, that the samples were important in the sale of carpeting and finally that at the time of termination some portion of the samples remained with its retail outlet customers. Not one shred of evidence, however, indicated that Beattie exercised even the slightest degree of control over the samples. Not one customer of Keystone testified that Beattie used the samples or took advantage of their presence in making even one sale. Clearly, there was not sufficient testimony to permit a jury to infer that Beattie in some way benefitted to the fullest extent imaginable by their mere presence in the field. Furthermore, one of plaintiff's witnesses testified that some significant quantity of the samples remained in Keystone's warehouse at the time of termination. Finally, the uncontradicted testimony of plaintiff's salesmen was that while they knew the samples were property of Keystone and could be taken back they refrained from doing this to preserve customer relations.

Where the evidence fails to demonstrate that Beattie exercised any control over the samples and where there was no evidence of how, when or to what extent Beattie was benefitted by the samples a jury could not properly conclude that Beattie was unjustly enriched. Thus, this measure of damage must be rejected.

The second item of damages sought to be established by plaintiff pertains to sales made by defendant in violation of the distributorship agreement. The first of these is the gross sales made by Beattie in the designated territory in the two years following termination yielding a damage figure of $1,554,882.45. It should be pointed out that Keystone has sought to justify this item on the basis of unjust enrichment contending that Beattie's purpose in capturing the samples was for the sale of its carpet. For reasons discussed above this claim is rejected, however, the damage proof will be considered here under the improper sales claim. The remaining proofs falling into this category are: (1) sales to Hockstein of $162,702.20; (2) pre-termination sales made by Beattie in the Keystone territory $10,-

973.98; and, (3) sales made by Beattie in the 60 days after termination of $20,639.99.

All four items of damage are, in effect, claims for lost profits. The Pennsylvania rule of law applicable to claims for loss of profits in a contract action permits such damages where (1) there is evidence to establish them with reasonable certainty and (2) there is evidence to show that they were within the contemplation of the parties. *Kaufhold, supra.*

The lost profit claims asserted by plaintiff suffer under the first requirement. All that plaintiff has shown with respect to these items is that the various sales have been made. In net effect, it is asking for an accounting. As stated in *American Air Filter Company, Inc. v. McNichol,* 3 Cir., 527 F.2d 1297, 1300 (1975):

"Although a similar remedy was available from common law courts, *an accounting has not served as a substitute for legal damages.* See 1 Pa.Law Enc., supra, 1 Am.Jur.2d, supra. The basis failing of plaintiff's theory is that defendant's profits are not necessarily equivalent to plaintiff's losses." (emphasis added).

Upon a review of the record it is clear that plaintiff has not established any basis supporting the conclusion that it would have made the sales for which it claims damages. None of Beattie's sales except those to Hockstein were even identified. With respect to Hockstein it was not shown that all of Hockstein's sales were made in Keystone's territory. Plaintiff has variously contended that it was Beattie's burden to make these showings; but, the burden is rightfully placed upon the plaintiff to prove its legal damages.

The Court further finds that plaintiff's damage claim relating to Beattie's sales two years after termination suffers under the second requirement set forth in *Kaufhold, supra.* Plaintiff has failed to offer any sustainable reasoning which establishes that under the breach of contract theory it is entitled to lost profits based on defendant's sales two years after the breach. Rather, as the Court reads *Massa-*

*chusetts Bonding, supra,* such a measure of damages must be restricted to the termination notice period. Since, under the terms of the contract, either party had the absolute right to cancel the agreement at any time with or without cause it must have been within the contemplation of the parties that 60 days after termination defendant could rightfully sell under any circumstances in Keystone's territory. Thus, any claim based on defendant's sales made thereafter under the breach of contract theory must fail.

The third item of damages asserted by plaintiff in support of the verdict was Martin Parelman's testimony pertaining to business disruption. At trial this testimony was presumably offered as to all four of plaintiff's causes of action then in the case. At that time the Court deemed such testimony worthy of the jury's consideration. In the context of this review, however, considering the testimony strictly as a measure of damages for breach of contract, it is not without defect.

Damage evaluations similar to Parelman's were made by defendant's experts in *Massachusetts Bonding, supra.* As previously noted, the Court therein criticized such proofs because the evaluations were made without consideration of the fact that the contract had an assured legal existence of only 30 days at any given point in time. The same criticism applies here. Moreover, there has been no basis established relating to the breach of contract claim which would justify, specifically, a two year projection. Finally, as the evidence demonstrates, Keystone's largest selling product was supplied to it by a manufacturer other than Beattie but Parelman's testimony, insofar as it pertains to an overall disruption of Keystone's business caused by the breach, fails to consider this factor. In short, while the Court believes there is some merit in this testimony it cannot be said that Parelman's figure of $298,980.00 can be considered, in full, as support for the $1.5 million award.

The final measure of damages sought to be established by Keystone pertains to a number of credits and other adjustments. These items are more appropriately considered in the Court's discussion of its ruling on damage evidence and Beattie's counterclaim.

## D. *RULINGS ON DAMAGE EVIDENCE*

Plaintiff's documentary evidence pertaining to the costs of the samples, sales to Hockstein and pre-termination sales by Beattie were not admitted into evidence and the Court believes properly so for reasons previously stated.[29] Plaintiff's Exhibit P–35 pertaining to Martin Parelman's testimony was not offered.

The remaining damage exhibits, Plaintiff's Exhibits P–26, P–27, P–28, P–30, P–33 and P–34, which have not been previously discussed, were also identified and offered during the presentation of plaintiff's case and presumably were intended as contract damages. Exhibits P–26, P–27, P–28 and P–34 totalling $49,796.76 are all clearly related to credits and adjustments claimed by Keystone against its open account with Beattie. In the Court's view these items could not properly be considered damages resulting from the asserted breach of contract since they were in no way related to it and they were, therefore, also excluded. The Court, however, permitted Keystone to assert these credits against Beattie's counterclaim and the exhibits were admitted into evidence for that limited purpose.

Exhibit P–29 which represented plaintiff's claim for cancellations following termination, Exhibit P–30 which represents plaintiff's claim for undetermined commissions and Exhibit P–33 which represents plaintiff's claim for merchandise paid for but not received were marked for identification and offered during plaintiff's case but were also excluded. In its brief plaintiff agrees that these items were properly excluded on the breach of contract claim. As it states:

". . . we also note the relatively small claims for cancellations in the

---

29. Plaintiff's Exhibits P–25, P–31, P–32, P–36, P–37, P–38 and P–39.

amount of $14,423.08 [P–29]; for 'Bill and Hold' items in the amount of $14,376.83 [P–33]; and for commissions in the amount of $5,977.37 [P–30]. While defendant argues 'causation' was not established as to the cancellations (Defendant's Supplemental Memorandum, p. 19), in all fairness to the defendant and the Court there was never any testimony as to the specific cancellation damages. As to the other items which defendant treats as part of the contract damages and dismisses as 'bookkeeping items' (p. 15, fn. 4), while plaintiff is agreeable to considering them as part of the contract damages, again in fairness they were treated as offsets to the open-account." (exhibit designations added).[30]

The exhibits discussed above constitute all of the damage exhibits offered by plaintiff. In addition to these exhibits and the testimony concerning them, the only other damage testimony concerned Richard Freed's estimate of lost profits of $1,544,882.45 based on 25% of Beattie's gross sales in its territory in the two years following termination. As previously stated, this damage proof cannot be sustained on the theory of unjust enrichment nor could it, as a matter of law, be considered as a measure of lost profits. This testimony, as defendant argued, should have been stricken from the record and the jury should have been instructed to disregard it. The fact that the jury was greatly influenced by this testimony cannot be doubted as the award was almost a mirror image of it. Furthermore, upon reconsideration, it also seems that the jury may have been confused to some extent by the assertion of the unjust enrichment claim. They should have been instructed that this claim was never made a part of the case. These omissions, in the Court's view, were errors of substantial magnitude.

### E. *BEATTIE'S COUNTERCLAIM*

Beattie contends that the jury arbitrarily reduced the amount of Keystone's indebtedness from $122,368.84 to $119,000.00 and that the jury erred, as a matter of law, in finding that Keystone was entitled to an offset of $47,800.00 when, in its view, the uncontradicted evidence at trial established that Keystone was entitled to no more than $3,979.19 as an offset.

As Keystone points out in response, Richard Freed's testimony regarding the open account was that, although the claimed amount was substantially correct, it was off by several thousand dollars. Based on this testimony the jury was warranted in reducing the balance to $119,000.00. The Court cannot now say it acted arbitrarily in so doing.

With respect to the set-off there was testimony and exhibits supporting plaintiff's claim for a total of $49,796.65. Robert Churchill of Beattie testified, however, that plaintiff was entitled to a set-off of only $3,979.19. The fact that the jury rejected his testimony was something that was entirely within their province to do. Since the jury awarded a set-off of only $47,800.00, the Court, again, can find no impropriety in their actions.

### III. NEW TRIAL

The defendant, is of course, entitled to a ruling on both motions presently before the Court. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

After a careful consideration of the facts in the record and the issues raised by Beattie in its post-trial motions pertaining to Keystone's breach of contract claim and Beattie's counterclaim, the Court concludes that both claims were properly submitted to the jury. Since the standard applicable to a directed verdict and a judgment notwithstanding the verdict are the same, *Neville, supra; Gatenby, supra,* the Court denies Beattie's motion for judgment notwithstanding the verdict as to both claims.

As previously stated, however, the Court finds merit in defendant's motion for a new trial pertaining to the award of

---

**30.** See Plaintiff's Supplemental Memorandum, note 28, supra at p. 60.

damages for breach of contract and the Court's rulings and testimony related thereto. In other respects defendant's position cannot be sustained. In short, the Court finds the damage award to be conscience shocking and would, if left to stand, amount to a miscarriage of justice. In accordance with Rule 59, Federal Rules of Civil Procedure, the Court has the authority, indeed, the duty, to order a new trial if the interests of justice so require.

The question arises, however, whether the Court should grant a new trial as to the entire contract claim or limit it to the question of damages. In *Gasoline Products Co., Inc. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1930) the Supreme Court provided that a new trial as to damages only may be granted if the issues are "clearly separable." The award here was apparently the result of the Court's failure to strike the testimony of Richard Freed pertaining to the $1.5 million claim and failure to caution the jury on the assertion of a claim for unjust enrichment. These omissions could have had no affect upon the resolution of any other issue and, thus, the award clearly could not have been the result of any compromise among the jurors. Moreover, in a contract claim, perhaps more so than in any other action, the law requires that damages be proved with reasonable precision. A new trial on the issue of damages will prejudice neither party where the damage question is distinct and the reason for granting a new trial has not in any way affected the determination of any other issue. *Romer v. Baldwin,* 317 F.2d 919, 922–23 (3d Cir. 1963); *Rosa v. City of Chester,* 278 F.2d 876 (3d Cir. 1960).

The damage proofs in this case have been clear and definable. From what has been stated, however, certain of the proofs cannot stand and, thus, cannot be relied upon as support for the award. The only arguably sustainable damage proof offered by plaintiff under the breach of contract theory is the business disruption testimony of Martin Parelman. Even though his testimony is not free from defect, with several modifications his projection of damages can be brought within acceptable bounds.

Parelman projected total business disruption damages to be $298,980.00 broken down into $224,160.00 for 1974 and $74,820.00 for 1975. As previously stated, there is no reason to consider asserted damages for a two year period, hence, the $74,820.00 for 1975 will not be considered. Assuming, however, that the principal consequence of the breach was Keystone's inability to make a smooth transition to new suppliers, it could be said that the eight month hiatus, which time was required by Keystone to obtain new suppliers, is causally related to two-thirds ($8/12$) of Parelman's damage projection for 1974. Assuming further that a jury would find that Keystone is entitled to a maximum award, as evidently occurred in the trial of this case, it would seem that under the circumstances such an amount would be an appropriate measure of damage. The calculation ($2/3 \times \$224,160.00$) yields a damage figure of $149,440.00.

While it is not suggested that the foregoing is a perfect estimate of damages, after a thorough examination of the damage evidence in the record, it does represent, in the Court's view, the maximum sustainable award under the breach of contract theory. Accordingly, the Court believes the appropriate procedure would be to conditionally grant a new trial on the issue of damages with an order of remittitur. *Holmes v. Wack,* 464 F.2d 86, 89 (10th Cir. 1972); *Garrett v. Faust,* 183 F.2d 625, 629 (3d Cir. 1950); *Boldurian v. A/B Svenska Amerika Linien v. J. A. McCarthy, Inc.,* 246 F.Supp. 413, 418 (E.D.Pa.1965); *Huddleston v. Crain Brothers, Inc.,* 183 F.Supp. 874, 875 (W.D. Pa.1960).